IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

DONALD JORDAN,

                        Petitioner,              **DECISION AND ORDER**
                                                 **No. 01-CV-0507(VEB)**

        -vs-

HANS WALKER,

                        Respondent.

_____

## I.      Introduction

        Donald Jordan ("Jordan" or "petitioner") has filed a *pro se* petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Erie County Court on one

count of second degree burglary (N.Y. Penal Law § 140.25(2)) and one count of third degree

robbery (N.Y. Penal Law § 160.05). The parties have consented to disposition of this matter by

the undersigned pursuant to 28 U.S.C. § 636(c)(1).

## II.     Factual Background and Procedural History

        Jordan's jury trial was conducted on May 21 to May 23, 1997, in Erie County Court

(Amico, J.). At trial, Meghan Weir ("Weir") testified that she woke up at about 10:00 a.m. on the

morning of October 31, 1996, and was watching T.V. in her bedroom at her parents' home at 42

Argyle Park in the City of Buffalo. T.108-09, 132.[1] About an hour later, when got up, she

happened to look out the window and saw a black man and woman walking down the street.  She

turned off the television and heard footsteps on the first floor. T.110, 134. Going downstairs, she

_____

[1]          Citations to "T.___" refer to the trial transcript.

saw that the cupboards had been ransacked, the television was missing, and the family's stereo equipment was in a pile on the deck outside the house. T.110. Weir returned to the second floor and unsuccessfully attempted to call her parents; she then called 911. T.111.

Upon hearing a car in the driveway, Weir went to an upstairs window and saw a green Ford Tempo sedan backing into her driveway. T.111-12. A black male exited the driver's side and a black female got out on the passenger's side. T.112-113. Weir recognized the two individuals, having seen them walking down her street earlier that morning. T.113-14. Weir positively identified the black male as Jordan after viewing a pre-trial photographic array, and she identified him at trial. T.115-18, 127.

Weir walked outside and inquired if she could help the man and the woman who had gotten out of the Ford Tempo. Jordan punched her in the jaw with his fist, cutting her lip and causing her to fall backwards onto the driveway. T.119-20. Jordan then placed a guitar case on top of her and, with his companion's assistance, began to load the trunk and passenger compartment of the Tempo with the electronic equipment, furs, and other property which had been stacked up on Weir's parents' back deck. T.117-23. Weir memorized the license plate number (J50-0PC) which was later determined to belong to a green Ford Tempo registered to Jordan. T.175.

Meanwhile, at about 11:20 a.m., Officers Manzella and Simonian of the Buffalo Police Department were about two blocks away from the crime scene when they received a call of a burglary-in-progress. As they arrived at 42 Argyle Park, Jordan and his female companion were hurriedly backing out of the driveway. T.85-87. Manzella noticed that the license plate had two zeros in the middle of it and that a man was driving the car with a woman in the rear passenger

side. T.88. The officers gave chase but were unsuccessful. T.88-89, 93.

At 1:15 p.m. that afternoon, Deputy Klemp and Sergeant Bennett of the Erie County Sheriff's Department were traveling down Box Avenue in the City of Buffalo when they spotted a car hidden mostly behind the house at 63 Box Avenue; the car matched the make, model, and license plate number of the car which had been used in the burglary at 42 Argyle Park. After turning around to head back to 63 Box Avenue, the officers noticed that the green Ford Tempo was leaving the driveway. T.152-61. They saw a tall, thin black male and a stockily-built black female jump out of the car and flee through a gap in the fence at the rear of the house. T.161-62.

Investigation revealed that the home at 63 Box Avenue belonged to Jordan's mother and was occupied by Jordan's brother, who provided the police with Jordan's address. T.171-72, 229. After the Ford Tempo was towed, the police obtained a search warrant which led to the discovery of most of the property stolen from the Weir residence. T.65-75, 171-72, 190-91. Also found in the car was a purse belonging to Diedra Moore ("Moore"), Jordan's girlfriend.

On November 5, 1996, about a week following the burglary, Jordan's Ford Tempo was reported stolen. Three days later, Detective Aronica of the Buffalo Police Department, with the assistance of troopers from the New York State Police, went to defendant's residence to execute an arrest warrant. After the police received no answer following their initial knock on the door, the landlord let them into the apartment, where they found Jordan hiding under his bed. T.179-80.

The defense presented alibi testimony from Jordan, Jordan's girlfriend, Diedra Moore ("Moore"), and his friend, Jacob Diggs ("Diggs"). Jordan testified that he was in Buffalo City Court for a court appearance with Moore during the time the burglary was committed and that he

spent the day with Moore. T.250-53. Moore testified that she accompanied Jordan to the court appearance and that his case was called at 10:55 a.m. T.226. She stated that at about 11:15 or 11:30 a.m., she and Moore went to the Main Place Mall for lunch. T.227. Moore testified that she spent the afternoon with Jordan and that Jordan did not drive his Ford Tempo that day but had left it behind at his mother's house at 63 Box Avenue because it needed repairs. T.229. Diggs testified that at about 11:00 a.m. on the morning of the burglary, he encountered Jordan and a woman in downtown Buffalo, and then the three of them went to Main Place Mall for lunch. Diggs estimated that he was with Jordan until 11:30 or 11:45 a.m. T.219-23. On cross-examination of several defense witnesses, the prosecution referred to a transcript of the city court proceedings for the day of the incident which indicated that Jordan's case was called between 10:13 and 10:23 a.m. Jordan, Diggs, and Moore were all substantially impeached on cross-examination. *See* T.219-39, 248-72.

The jury returned a verdict convicting Jordan as charged in the indictment. He was sentenced on September 2, 1997, as a persistent violent felony offender, to an indeterminate term of imprisonment of sixteen years to life on the burglary conviction and a concurrent indeterminate term of three and one-half to seven years on the robbery conviction.

On direct appeal, appellate counsel argued (1) that the introduction of third-party testimony by Detective Aronica to bolster the out-of-court identification of petitioner by the complainant, Meghan Weir, was reversible error; and (2) that prosecutor improperly commented regarding petitioner's during summation deprived  petitioner of a fair trial. *See* Pet'r App. Br., Resp't Ex. B. Dissatisfied with appellate counsel's choice of issues, Jordan submitted a supplemental *pro se* appellate brief in which he argued (1) that his constitutional rights were

violated "when he was tried by a jury not of his peers" in "violation [of] U.S. Const. 14 Amend. N.Y. Const. Art. I"; and (2) that unauthenticated photographs of the crime scene and of petitioner were erroneously admitted. The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed the conviction in a memorandum decision and order. *People v. Jordan*, 261 A.D.2d 947 (App. Div. 4th Dept. 1999). The Appellate Division rejected the jury pool claim on the merits and found that the remaining claims regarding the photographs, the bolstering testimony by the police officer, and the prosecutorial misconduct were all unpreserved for review due to petitioner's failure to register a timely objection to any of the errors pursuant to New York's contemporaneous objection rule. *People v. Jordan*, 261 A.D.2d at 947 (citations omitted).  The Appellate Division held that, in any event, any alleged error in the admission of the officer's testimony was harmless and the prosecutor's remark did not "warrant reversal[.]" *Id.* (citations omitted). Leave to appeal to the New York Court of Appeals was denied. *People v. Jordan*, 93 N.Y.2d 1003 (N.Y. 1999).

On February 15, 2000, proceeding *pro se*, Jordan brought an application in the trial court to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10, arguing (1) that trial counsel was ineffective in (a) failing to properly question the deputy commissioner of jurors at the hearing regarding the racial composition of the jury pool, (b) failing to object to the introduction of unauthenticated photographic evidence, (c) failing to object to bolstering testimony by a police officer, and (d) failing to object to an improper remark by the prosecutor. *See* Pet'r C.P.L. § 440.10 Motion, Resp't Ex. D. The prosecution opposed the motion, arguing that all of petitioner's claims were procedurally barred because they were record-based and could have been, or were raised, on direct appeal. *See* N.Y. Crim. Proc. Law §

440.10(2)(a), (b), (c). The trial court rejected all of Jordan's claims on the basis that sufficient facts appeared on the record to have permitted the Appellate Division to entertain said claims on direct appeal. Order dated July 10, 2000 Denying C.P.L. § 440.10 Motion ("Where, as here, the allegations of ineffectiveness appear on the face of the record, a Defendant who fails to raise those claims on direct appeal, may not avail himself of review by way of post-conviction motion.") (citing N.Y. Crim. Proc. Law § 440.10(2)(c); *People v. Cooks*, 67 N.Y.2d 100, 103). On May 10, 2001, Jordan's application for leave to appeal to the Appellate Division was denied.

Jordan filed an application for a writ of error *coram nobis* in the Appellate Division on April 5, 2001, arguing that appellate counsel was ineffective in failing to assert on direct appeal that trial counsel provided constitutionally ineffective representation for all of the reasons stated in Jordan's C.P.L. § 440.10 motion. *See* Pet'r *Coram Nobis* Application, Resp't Ex. D. Jordan also stated that appellate counsel should have argued that his sentence was unduly harsh and severe. *See id*. The prosecution opposed the motion, asserting that Jordan received meaningful representation from his trial counsel and therefore appellate counsel had no basis on which to argue that trial counsel was ineffective. Furthermore, since Jordan received the minimum sentence that was possible under the Penal Law, given his status as a persistent violent felony offender, appellate counsel had no basis to challenge the length of the sentence. The Appellate Division denied the writ in a summary order entered July 3, 2001.

This federal habeas petition followed in which Jordan asserts that following grounds for relief: (1) trial counsel was ineffective; (2) appellate counsel was ineffective in failing to argue on direct appeal that trial counsel was ineffective; and (3) the jury pool did not represent a "fair cross section" of the community in violation of petitioner's rights under the Sixth Amendment.

*See* Petition ("Pet.") (Dkt. #1); Petitioner's Memorandum of Law ("Pet'r Mem.") (Dkt. #2).

For the reasons set forth below, the Court denies Jordan's request for a writ of habeas corpus and dismisses the petition.

## III.   Exhaustion and Procedural Default

A petitioner must exhaust all available state remedies either on direct appeal or through a collateral attack of his conviction before he may seek a writ of habeas corpus in federal court.  28 U.S.C. § 2254(b); *see also Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995).  The exhaustion of state remedies requirement means that the petitioner must have presented his constitutional claim to the highest state court from which a decision can be obtained.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

The Supreme Court has made clear that the "adequate and independent state ground doctrine applies on federal habeas," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262 (1989) (citations & internal quotations omitted); *see also Coleman v. Thompson*, 501 U.S. 722, 735 (1991); *Murray v. Carrier*, 477 U.S. 478, 485-88, 496 (1986); *Garcia v. Lewis*, 188 F.3d 71, 76-77 (2d Cir. 1999); *Reyes v. Keane*, 118 F.3d 136, 138-40 (2d Cir. 1997); *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996), *cert. denied*, 520 U.S. 1108 (1997); *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir.1990).

Respondent concedes that Jordan has properly exhausted all of the claims raised in the present habeas petition but argues that the claims of ineffective assistance of trial counsel are

procedurally barred because the trial court relied upon an adequate and independent state procedural bar (*i.e.*, C.P.L. § 440.10(2)(c)) to dismiss these claims when Jordan raised them in support of his motion for *vacatur*. The Court agrees with respondent that Jordan's claims of ineffective assistance of trial counsel are barred by an independent and adequate state ground. *See Sweet v. Bennett*, 353 F.3d 135, 140-41 (2d Cir. 2003) ("Thus we conclude that Sweet's appellate counsel unjustifiably failed to argue this ineffective assistance claim on direct appeal despite a sufficient record, and consequently waived the claim under [C.P.L.] § 440.10(2)(c). Accordingly, Sweet's [ineffective assistance of trial counsel] claim is procedurally defaulted for the purposes of federal habeas review as well."); *see also Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997) (holding that where the trial record provided a sufficient basis for the ineffective assistance claim premised on trial counsel's failure to object to a jury charge, such a claim did not fall within any of the exceptions noted by the New York courts for claims that are appropriately raised in a collateral motion for vacatur rather than direct appellate review); *Aparicio v. Artuz*, 269 F.3d 77, 91 (2d Cir. 2001) (holding that C.P.L. § 440.10(2)(c) barred habeas review of a claim alleging ineffective assistance for failing to object on double jeopardy grounds because defendant unjustifiably failed to raise the ineffective assistance issue on direct appeal).

Because there is an adequate and independent finding by the state court that Jordan procedurally defaulted the ineffective assistance of trial counsel claims raised in his C.P.L. § 440 motion, Jordan must show in his habeas petition "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U .S. 722, 750

(1991). Jordan has not asserted cause and prejudice, and neither is apparent on the record before

the Court. Furthermore, Jordan has not attempted to make the showing of "actual innocence"

required to qualify for the "fundamental miscarriage of justice" exception. *See Schlup v. Delo*,

513 U.S. 298, 314-16 (1995).  Jordan's ineffective assistance of trial counsel claims are

procedurally barred from federal habeas review and are dismissed on that basis.

## IV.    Merits of the Petition

### A.    "Fair Cross Section" Claim Regarding the Racial Composition of the Jury Pool

On the first day of jury selection, defense counsel raised an objection to the composition

of the jury venire, stating that he had "never encountered a jury, panel of jurors with only one

black juror out of 36[.]" J.S.13.[2] The trial court offered to hold a hearing to "find out how this

particular panel was constituted" and indicated that he would request the Deputy Commissioner

of Jurors, Paul Gaughan, to appear. J.S.13-14.   The deputy commissioner testified that in Erie

County, the jurors are "randomly selected" from "various venues, New York State vehicle

licensing, New York State income tax, voter registration, Social Service lists," as well as "utility

lists[.]" J.S.16,18. One hundred twenty (120) potential jurors were brought in, and the forty (40)

jurors who appeared for petitioner's trial were "randomly selected from the pool of jurors that

reported today, by computer." J.S.16-17. On cross-examination, the deputy commissioner stated

that he did not know what percentage of black individuals made up the pool of 120 potential

juror, nor did he know what was the percentage of black individuals in the county-wide pool of

prospective jurors. J.S.17.   The deputy commissioner testified on re-direct that the random juror-

---

[2]        Citations to "J.S.__" refer to the transcript of jury selection.

selection process includes the entire City of Buffalo, including the east and west sides of the city where a large portion of black individuals resides. J.S.18-19. The trial court questioned the deputy commissioner to clarify how the names are compiled in Albany on the main frame computer; each county summons jurors residing the particular county off that main list. J.S.19. Each week, in Erie County, 1900 individuals are randomly selected by a computer program run on the main-frame computer in Albany. The deputy commissioner indicated that his office does not know the ethnic background of any of the prospective jurors. Nor does his office know where the prospective jurors reside in Erie County. J.S.20. These 1900 jurors are randomly numbered. When they report to the jury room, the jury selection clerk, once authorized to select 40 individuals for a particular proceeding before a judge, goes into the computer and randomly selects 40 individuals from the panel that is in the jury assembly room. J.S.21.

At the close of the testimony from the commissioner of jurors, defense counsel argued that "there's only one black man on that panel of 40 [jurors], and I believe that's totally inadequate to try this case with my client with the circumstances as it is." J.S.21. The trial court denied defense counsel's challenge to the jury panel, "find[ing] that the panel [wa]s properly constituted in accordance with the Judiciary Law[.]" J.S.22.

On the second day of jury selection, trial counsel noted that the one juror from the first day's panel who was thought to be black actually was a Caucasian of Indian descent. J.S.221. Trial counsel asserted another challenge to the racial composition of the jury panel, noting that in the second day's panel of jurors, there was only one black person. J.S.221. The trial court agreed to hold another hearing and re-call the deputy commissioner of jurors to testify. J.S.221-22.  The deputy commissioner testified consistently with how he had testified at the first hearing, and trial

court again found the panel to have been constituted in accordance with the Judiciary Law.

J.S.222-25. On direct appeal, the Appellate Division held that

> Defendant failed to "substantiate his claim that the African-American community
> [in Erie County] was underrepresented in [the] jury pools . . . as a result of a
> 'systematic exclusion' of these individuals in the jury-selection process[.]"

*People v. Jordan*, 261 A.D.2d 947, 690 N.Y.S.2d 797, 798 (citations omitted).

The Sixth Amendment requires that jury panels be drawn from a source representing a

"fair cross section" of the community in which the defendant is tried. *Taylor v. Louisiana*, 419

U.S. 522, 536 (1975); *accord United States v. Jackman*, 46 F.3d 1240, 1244 (2d Cir. 1995). The

Supreme Court has explained that the Sixth Amendment's "fair cross-section" requirement

applies only to the larger pool serving as the source of prospective jurors' names and not to the

petit jury sworn for a defendant's trial. *See Taylor*, 419 U.S. at 538 ("Defendants are not entitled

to a jury of any particular composition."); *accord Jackman*, 46 F.3d at 1244. The Sixth

Amendment therefore "guarantees the *opportunity* for a representative jury venire, not a

representative venire itself." *Jackman*, 46 F.3d at 1244 (citing *Roman v. Abrams*, 822 F.2d 214,

229 (2d Cir. 1987), *cert. denied*, 489 U.S. 1052 (1989) (emphasis in original)).

In *Duren v. Missouri*, the Supreme Court set forth the three elements that must be shown

to establish a *prima facie* violation of the "fair cross-section" requirement: (1) that the group

alleged to be excluded is a "distinctive" group in the community; (2) that the representation of

this group in venires from which juries are selected is not fair and reasonable in relation to the

number of such persons in the community; and (3) that this underrepresentation is due to the

systematic exclusion of the group in the jury-selection process. *Duren*, 439 U.S. 357, 364

(1979); *accord, e.g.*, *United States v. Rioux*, 97 F.3d 648, 654 (2d Cir. 1996); *United States v.*

*Gelb*, 881 F.2d 1155, 1161 (2d Cir. 1989).

Jordan has satisfied the first prong of the *Duren* test: Blacks are unquestionably a "distinctive" group for the purposes of a fair-cross-section analysis. *Jackman*, 46 F.3d at 1246 (citation omitted). Jordan, however, has failed to establish the remaining two prongs of the tripartite *Duren* test. Jordan asserts that it is a "virtual mathematical impossibility to have eighty potential jurors on a panel, in Erie County, and not have even one black on the panel." Pet'r Mem. at 12 (Dkt. #2). Contrary to Jordan's assertion, there was one black juror in the second pool of prospective jurors called for jury duty.  *See* J.S.221. But the fact that there was only one black juror in a pool of 104 potential jurors does not, in and of itself, establish the *Duren* requirements of unfair underrepresentation and systematic exclusion. *See United States v. Joyner*, 201 F.3d 61, 75 (2d Cir. 2000). In *Joyner*, the defendant argued that his Sixth Amendment right to a jury of his peers was violated as the venire contained only one black out of 500 prospective jurors. The Second Circuit found that defendant "failed to establish a *prima facie* case because he made absolutely no showing that African Americans were systematically excluded or that the district court's use of voter registration and motor vehicle bureau lists to select the venire result[ed] in unfair underrepresentation." *Id.* (citing *Duren v. Missouri*, 439 U.S. at 364); *United States v. Rioux*, 97 F.3d 648, 655-56 (2d Cir. 1996)). *See also Johnson v. United States*, 10 F. Supp.2d 390, 392 (S.D.N.Y. 1998) (defendant claimed that he was denied an impartial jury in violation of his rights under the Sixth and Fourteenth Amendments because "no black member of the community was available for his trial" and that failure "to provide some black members of the community to sit on the jury injected a strong potential for prejudice because petitioner was not tried by a jury comprised of his peers"; district court held that defendant failed to show that a

distinctive group's representation on the jury venire was not fair and reasonable in relation to the numbers of such persons in the community or that the under-representation was due to the systematic exclusion of the group in question; defendant presented "nothing in support of his claim that the jury selection process utilized to obtain jurors for his trial did not afford him the opportunity" for a representative jury venire) (citing *United States v. Jackman*, 46 F.3d at 1244).

Jordan argues that his case is analogous to *United States v. Jackman* which he characterizes as a case in which the Second Circuit found the "jury pool selection process simply eliminated a very substantial section of eligible jurors from said selection process." Pet'r Mem. at 12 (Dkt. #2). Without any support, Jordan contends that the same situation found to exist in *Jackman* also exists in Erie County's jury selection system. *Id.* A careful review of *Jackman* shows that Jordan is mistaken. In *Jackman*, defendant's appeal concerned a procedure adopted by clerical staff in the District Court for the District of Connecticut "to remedy a jury selection process that had inadvertently, but systematically, excluded from petit jury venires all residents of Hartford and New Britain, communities with large minority populations." 46 F.3d at 1241. The Second Circuit found that the procedure adopted was not adequate to cure the constitutional infirmities in the old procedure because the jury clerk continued to supplement her list of prospective jurors using a bank of names derived from the old wheel of jurors "that had totally excluded Hartford and New Britain residents[.]" *Id.* at 1245. As the Second Circuit pointed out, the jury clerk's "remedy was bound to fail" since "any random selection of names derived from both the old wheel and the new wheel, without some careful adjustment, would inevitably produce a 'picking list' that permitted the underrepresentational effect of the old list to continue to taint the 'picking list.'" *Id.* After an extended discussion of the statistics presented by

defendant and an assessment of the representativeness of the jury pool system, *see id.* at 1246-48, the Second Circuit found that defendant had established unfair underrepresentation and that such underrepresentation was the result of a "'systematic exclusion in the jury-selection process,' *Duren*, 439 U.S. at 366), specifically the clerk' s decision to select most potential jurors from the [old, constitutionally-infirm] jury pool." *Id.* The Second Circuit found that, "[l]ike the prior total exclusion of Hartford and New Britain residents from the jury pool, the underrepresentation [in Jackman's jury pool] 'was quite obviously due to the system by which juries were selected.'" *Id.* (quoting *Duren*, 439 U.S. at 367). By contrast, Jordan has made no showing that the procedure by which the pool of prospective jurors is selected in Erie County systematically excluded from petit jury venires all residents of the communities within Erie County having large minority populations, as did the procedure in *United States v. Jackman*. To the contrary, the deputy commissioner of jurors testified at the hearing in Jordan's case that "potential pool of jurors is drawn from all areas of Erie County, including the City of Buffalo," where a "large number of African Americans reside[.]" J.S.223; *see also* J.S.18.  The names come from a variety of sources, including New York State motor vehicle licensing, New York State income tax, voter registration, the Department of Social Services, and utility company billing lists. *See* J.S.16, 223.

    Having failed to establish the second and third prongs of *Duren*, Jordan has not set forth a *prima facie* case of a violation of the Sixth Amendment's "fair cross-section" requirement and his claim is dismissed. *See United States v. Schlesinger*, 360 F. Supp.2d 512, 527 (E.D.N.Y. 2005) (rejecting "fair cross section" claim on the basis that defendant could not show unfair underrepresentation or systematic exclusion where jury selection plan made no distinction between the jury pool available for Long Island cases and Brooklyn cases and juror names for

grand and petit jurors were selected at random from the voter registration lists of all the five counties within the Eastern District of New York, Kings, Queens, Richmond, Nassau, and Suffolk, supplemented by lists for these counties from the New York State Department of Motor Vehicles and other lists for the five counties).

**B.      Ineffective Assistance of Appellate Counsel**

Jordan asserts that appellate counsel should have raised a number of claims that trial counsel was ineffective–namely, that trial counsel erred in failing to object to the admission of "bolstering" testimony by a police officer regarding the complainant's identification of petitioner, failing to object to the admission of photographs of petitioner's car and the burglarized house, failing to object to a remark by the prosecutor regarding petitioner's lack of credibility, and failing to object to the admission of testimony by the deputy commissioner of jurors at the hearing regarding the racial composition of the jury pool.  All of these grounds of alleged ineffectiveness on the part of trial counsel were raised as stand-alone claims on direct appeal or as instances of trial counsel's ineffectiveness in the context of the C.P.L. § 440.10 motion. Respondent argues that Jordan merely has "repackaged these barred and meritless individual claims" of ineffective assistance of trial counsel into alleged bases on which appellate counsel should have argued that trial counsel was ineffective. Jordan also asserts that appellate counsel should have argued that his sentence was unduly harsh and excessive.

To prevail on an ineffective assistance of counsel claim, petitioner must satisfy the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the petitioner must demonstrate that his "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. Second, he must show that counsel's deficient performance

prejudiced his defense. *Id.* at 692. To demonstrate prejudice, petitioner must prove that, but for counsel's errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Id.* at 694. Failure to satisfy either requirement of *Strickland*'s test is fatal to a claim of ineffective assistance. *See id.* at 696 ( "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." ).

Although *Strickland*'s two-pronged test was originally formulated to judge trial counsel's performance, it applies in the context of evaluating the effectiveness of appellate counsel's representation as well.  *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). To  establish that appellate counsel failed to render effective assistance, a petitioner must do more than simply demonstrate that counsel omitted a non-frivolous argument, because appellate counsel is not required to raise all potentially colorable arguments. *Id.* (citing *Jones v. Barnes*, 463 U.S. 745, 754 (1983)). Failure to raise an argument on appeal constitutes ineffective assistance only when the omitted issue is clearly stronger and more significant than those presented. *See id.* (citing *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). To establish the requisite level of prejudice resulting from appellate counsel's shortcomings, a petitioner must establish that there is a reasonable probability that the omitted "claim would have been successful before the [state's highest court]." *Id.* (quoting *Claudio v. Scully*, 982 F.2d 798, 803-05 (2d Cir. 1992)); *see also People v. La Hoz*, 131 A.D.2d 154, 158 (App. Div. 1st Dept. 1987) ("The burden lies with those raising the issue to rebut the presumption that counsel has been effective. The mere existence of an unraised issue will not suffice. A defendant must show that had the issue been raised a greater likelihood would exist that the judgment would have been reversed, or at least, modified. The

right of appeal only guarantees review, not reversal."), *appeal dism'd* 70 N.Y.2d 1005 (N.Y. 1988).

The Court first examines the claims that appellate counsel erred in failing to argue on direct appeal that trial counsel was ineffective in failing to object to the following errors and thereby properly preserve them for appellate review: 1) that Detective Aronica improperly bolstered the identification testimony of the complainant, Meghan Weir, by testifying that she had identified petitioner as the perpetrator from a photographic array that he had displayed to her (Ground 1c in Pet'r Mem.), and 2) that the prosecutor committed misconduct by commenting that Jordan had a motive to lie in his testimony (Ground 1d in Pet'r Mem.). On direct appeal, appellate counsel asserted independent claims regarding both these of these issues and the Appellate Division reviewed the merits of both, despite the lack of preservation by timely objection. With regard to the admission of the bolstering testimony by the police officer, the Appellate Division found that any error in the testimony was harmless. The Appellate Division similarly found that the unobjected-to remark by the prosecutor did not warrant reversal. Given that the Appellate Division rejected the stand-alone claims as without merit, an ineffective assistance of trial counsel premised on the failure to object to those same errors necessarily would have been rejected by that court as well. Appellate counsel's failure to assert claims that have little or no chance of success on the merits clearly did not amount to ineffective assistance of counsel. Rather, it is the "hallmark of effective appellate advocacy" to choose wisely which claims are brought on appeal. *Smith v. Murray*, 477 U.S. 527, 536 (1986). Furthermore, Jordan is unable to prove prejudice since omission of insignificant claims that will likely be unsuccessful does not prejudice a defendant. *See Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir.1994) ("To

establish prejudice in the appellate context, a petitioner must demonstrate that 'there was a

"reasonable probability" that [his] claim would have been successful . . . .'") (alteration in

original) (quoting *Claudio v. Scully*, 982 F.2d at 803); *see also Bolender v. Singletary*, 16 F.3d

1547, 1573 (11th Cir.1994) ("[T]he failure to raise nonmeritorious issues does not constitute

ineffective assistance." ).

Jordan also asserts that appellate counsel erred in failing to argue that trial counsel

erroneously failed to object to the admission into evidence of two photographs, People's Exhibit

27 and People's Exhibit 58, on the basis that they were not properly authenticated. Jordan asserts

that these photographs were introduced into evidence during the direct examination of the

complainant. Pet'r *Coram Nobis* Mot. at 6 (citing T.112). Exhibit 27 is a photograph of the

complainant's house; Exhibit 58 is a photograph of the green Ford Tempo sedan that she saw in

the driveway on the day of the burglary. *See* T.112-13. Jordan also makes the blanket assertion

that there was "no attempt" to "authenticate" "any" of the photographs introduced into evidence

by demonstrating that they "accurately depict[ed] the 'condition that existed at the time of the

event in controversy.'" Pet'r Mem. at 9 (Dk.t #2). Jordan has offered no evidence to suggest that

the photographs did not, in fact, accurately depict the car and the house as they appeared at the

time of the incident.  He also has made no argument as to how the admission of Exhibits 27 and

58, or any of the other photographs introduced into evidence at his trial, prejudiced the defense in

any way. As respondent points out, the defense relied upon a theory of misidentification and

attempted to establish an alibi for petitioner–the appearance of the car and the house had no

bearing whatsoever on these issues.  Jordan has not demonstrated that there was an error of state

evidentiary law in admitting any of the photographs, much less that there was an error of federal

constitutional magnitude. This claim is wholly without merit and appellate counsel certainly was

not deficient in choosing not to pursue it on direct appeal.

Jordan also argues that appellate counsel was ineffective in failing to argue that trial

counsel mishandled the questioning of the deputy commissioner of jurors during the hearing

regarding the racial composition of the jury pool. According to Jordan, the deputy

commissioner's "testimony was based on his alleged expert opinion and familiarity with the jury

panel selection process" but "[i]n reality he was not an expert and in fact had absolutely no

knowledge as to how the computer generate selection process function." Pet'r Mem. at 15 (Dkt.

#2). Jordan contends that "no foundation was laid to establish [the deputy commissioner's]

expert opinion or even his familiarity to the subject matter and his testimony should not have

been admitted." *Id.*

First, there was no attempt by either party to qualify the commissioner of jurors as an

expert witness; he was called simply as a fact witness. Second, the deputy commissioner did

provide testimony regarding his familiarity with the subject matter about which he testified.

Jordan has not provided a legally colorable basis on which trial counsel could have objected to

having the deputy commissioner of jurors give testimony at the hearing and he has  failed to

suggest who, instead of the deputy commissioner of jurors, should have testified. Third, and most

important, as discussed above in greater detail, the Appellate Division considered the merits of

Jordan's stand-alone claim that jury pool's composition was racially disproportionate and

rejected it. There is no likelihood that an ineffective assistance of trial counsel claim premised on

counsel's questioning of the witness at the jury pool composition hearing would have fared any

better on direct appeal. Jordan thus was not prejudiced by appellate counsel's decision not to

pursue a claim based trial counsel's handling of the jury pool composition issue at the trial court level. *See Hayden v. Costello*, No. 9:99-CV-1194, 2007 WL 509566, at *17 (N.D.N.Y. Jan. 13, 2007) ("[Petitioner] has made no showing whatsoever that African-Americans were systematically excluded from the jury selection process that created the subject jury pool. That failure of proof prevents Hayden from succeeding on his fair cross section claim. Since Hayden could not establish all three factors necessary to prevail on his fair cross section claim, his trial attorney did not act in an objectively unreasonable manner in failing to raise this claim at petitioner's criminal trial. Additionally, Hayden's appellate counsel cannot be found to have been acted in an objectively unreasonable manner because he failed to assert such a claim in the context of Hayden's direct appeal of his conviction. . . .").

Finally, Jordan contends that appellate counsel was ineffective in failing to object to the harshness and severity of the sentence of sixteen years to life he received as a persistent violent felony offender. Jordan contends that because he is "now 53 years old . . . said sentence is tantamount to a sentence of death." Pet'r Mem. at 20 (Dkt. #2). Because Jordan received the minimum sentence possible under New York's Penal Law, given his predicate felon status,[3] the Appellate Division had no authority to modify his sentence in the interests of justice on the basis that it was harsh and excessive. Appellate counsel had no obligation to make an argument lacking a colorable basis in the law, and Jordan was not prejudiced by the omission of this argument on appeal since it had no chance of success on the merits.

---

[3] The Court notes as an aside that Jordan has made no showing whatsoever that he was improperly adjudicated as a persistent violent felony offender.

**V.      Conclusion**

For the reasons stated above, Donald Jordan's petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because Jordan  has failed

to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate

of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:      August 14, 2007
                  Buffalo, New York.